## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RAMON SOTO, *individually and on behalf of all others similarly situated*, | |
| Plaintiff, | Case No. |
| v. | **CLASS ACTION COMPLAINT** <br> <u>**JURY TRIAL DEMANDED**</u> |
| GENE BY GENE, LTD., d/b/a FAMILY TREE DNA, | |
| Defendant. | |

Plaintiff Ramon Soto ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Gene by Gene, Ltd. d/b/a FamilyTreeDNA ("FamilyTreeDNA" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

### <u>NATURE OF THE ACTION</u>

1.  This is a class action against Defendant for violating Plaintiff's privacy rights under the Illinois Genetic Information Privacy Act, 410 ILCS 513, *et seq.* ("GIPA") by disclosing consumers' genetic testing information through the use of a hidden tracking code created by Meta Platforms, Inc. (formerly known as Facebook) ("Facebook") and integrated into Defendant's online platform for purchasing and analyzing genetic testing, familytreedna.com (the "Website").

2.  FamilyTreeDNA is a Texas based genetic testing company that offers analysis of autosomal DNA, Y-DNA, and mitochondrial DNA to individuals for genealogical purposes.

3.  Through the Website, users may order a genetic test that is then analyzed by Defendant for a variety of genealogical indicators. For example, according to the Website,

Defendant's Y-DNA test allows users to "uncover [their] paternal line's story, discover new connections, and break through patrilineal brick walls." The Family Finder test is similarly advertised to allow users to "[d]iscover [their] origins and connect with [their] autosomal DNA matches."

4.      To do so, a user places an order for the genetic test and then receives a swab in the mail for them to use on their inner cheeks. Once the user mails the test back and Defendant's lab processes it, the user may review the results on the Website by logging into their account.

5.      However, unbeknownst to users, Defendant is sharing their genetic information and identity with third parties, including Facebook.

6.      The GIPA was passed to protect the public because "many members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law or will be used in a discriminatory manner." 410 ILCS 513/5.

7.      Under the GIPA, "genetic testing" and "genetic test" mean "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes." 410 ILCS 513/10; 45 CFR I 60.103.

8.      Defendant's tests are used to detect genotypes, and therefore Defendant is subject to the GIPA.

9.      Under the GIPA, "[n]o person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed … in a manner that permits identification of the subject of the test[.]" 410 ILCS 513/30.

10.     In direct violation of the GIPA, Defendant intentionally discloses the identity of consumers upon whom the genetic test is performed.

## PARTIES

11.     Plaintiff Ramon Soto is and was at all times relevant herein, an individual citizen of the State of Illinois, currently residing in Chicago, Illinois.

12.     In or around June 2023, Plaintiff used a web browser to access familytreedna.com and purchased a Y-DNA genetic test for himself.  Defendant subsequently performed genetic testing on Plaintiff, which included genotype detection, and reported to him his results, including information about his ancestry, via Defendant's Website.  Plaintiff has interacted with the Website since then, including to view his family tree and other information derived from the testing that is only accessible to customers who have completed genetic testing.

13.      Plaintiff has an active Facebook account which he has routinely logged onto on the same web browser he used to access Defendant's website.  Because of this, Facebook received the URLs Plaintiff accessed on the Website which included his genetic information and identity.

14.     Defendant Gene by Gene, Ltd. d/b/a FamilyTreeDNA is a company organized and existing under the laws of Texas, with its principal place of business located at 1445 N Loop W, Houston, TX 77008.

15.     Defendant disclosed to third parties, including Facebook, Plaintiff's genetic testing information in a manner that permits third parties, including Facebook, to identify Plaintiff as having requested, purchased and completed a genetic test.

16.     Plaintiff did not provide consent to this disclosure in a manner that complies with the GIPA.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed

class are in excess of $5,000,000.00, exclusive of interest and costs, there are more than 100 class members, and at least one member of the proposed class is citizen of state different from at least one Defendant.

18.     This Court has personal jurisdiction over Defendant because Defendant specifically and knowingly targets consumers in Illinois and avails itself of the laws and privileges of the State of Illinois, and Plaintiff and Class Members accessed Defendant's website in the State of Illinois and had their privacy rights violated in the State of Illinois.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### I.     THE ILLINOIS GENETIC INFORMATION PRIVACY ACT

20.     Recognizing that "[t]he public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information," the Illinois Legislature enacted the GIPA. 410 ILCS 513/5.

21.     Under the GIPA, "genetic information" includes "[a]ny request for, or receipt of, genetic services, … by the individual or any family member of the individual." 410 ILCS 513/10; 45 CFR 160.103.

22.     Under the GIPA, "genetic services" means, among other things, "[a] genetic test." 410 ILCS 513/10; 45 CFR 160.103.

23.     Under the GIPA, "genetic testing'' and "genetic test" mean "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes." 410 ILCS 513/10; 45 CFR I 60.103.

24.     Under the GIPA, genetic testing and genetic information is confidential.

25.    Section 15 of the GIPA proscribes any person from, among other things, disclosing genetic testing and information derived from genetic testing to any person other than the individual tested or to persons specifically authorized in writing in accordance with the Act. See 410 ILCS 513/l5(a).

26.    Section 30 of the GIPA, in turn, separately provides that "[n]o person may disclose ... the identity of any person upon whom a genetic test is performed … in a manner that permits identification of the subject of the test," except to certain enumerated third parties not applicable here.  410 ILCS 513/30(a).

27.    As discussed throughout this Complaint, Defendant violates the GIPA by disclosing to a third-party marketing company the identities of individuals who requested, purchased, and completed a genetic test in a manner that permitted their identification.

## II.    DEFENDANT INTERGRATES THE FACEBOOK PIXEL INTO ITS WEBSITE

28.    Per Plaintiff's counsel's investigation, Defendant discloses to Facebook the identity of persons who purchase and take a genetic test from Defendant in the form of their Facebook account name.  This is achieved through Defendant's integration of a piece of tracking pixel called the Facebook Pixel ("Facebook Pixel" or "Pixel") onto the Website.

29.     Per a research paper presented at the Association for Computing Machinery Web Conference 2023, "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it."[1] "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel loads in the HTML code of the page on the browser."[2]  "[I]f a corresponding … cookie does not exist on the browser, one is created and a unique ID is saved[.]"[3]  Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (i.e., Facebook)] servers[] … [and] report[s] to [the third party (i.e., Facebook)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user. This] can be used [] to track [] audiences for brand ads[.]"[4]

---

[1] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs* (Apr. 2023) at 2, https://arxiv.org/pdf/2208.00710.

[2] *Id.*

[3] *Id.*

[4] *Id.*

30.     To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of JavaScript code [that] acts as an 'initiator' for the [tracking p]ixel['s] behavior."[5]  Once active, this code will load "a library of functions [(i.e., fbevents.js for the Pixel] … on the website[.] … This library is the core mechanism[s] of the FB Pixel."[6]  In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Facebook], by defining events, i.e., actions, that a user takes on the website."[7]  When in use, the tracking pixels then "reports to [Facebook] information about [each] event and [the] user that caused it," for Facebook's "future use in ad-conversion and further user profiling and tracking[.]"[8]

31.     Defendant discloses users' personally identifying information and the information they viewed or obtained, including the genetic tests they purchased on the Website and took, to Facebook so that it can obtain the marketing, advertising, and analytics technological tools that Facebook provides.

32.     Facebook describes itself as a "real identity platform,"[9] meaning users are allowed only one account and must share "the name they go by in everyday life."[10]  To that end, when creating a Facebook account, users must provide their first and last name, along with their birthday and gender.

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[10] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

33.     In 2021, Facebook generated $117 billion in revenue.  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.

34.     Facebook sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its site.[11] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[13]

35.     Advertisers can also build "Custom Audiences."[14]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15]  With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16]

---

[11] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[12] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting

[13] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.

[14] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[15] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.

[16] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

36.     Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[17]

37.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[18]

38.     Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

39.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[19]

---

[17] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[18] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087

[19] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

40.     Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[20]  Advertisers can even create their own tracking parameters by building a "custom event."[21]

41.     One such Business Tool is the Meta Pixel (the "Facebook Pixel").  Facebook offers this piece of code to advertisers, like Defendant, to integrate into its website.  The Facebook Pixel "tracks the people and type of actions they take."[22]  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  At relevant times, two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

42.     Defendant chose to include the Facebook Pixel on its Website.

43.     Facebook's own documentation makes clear just how much tracking of private information the Facebook Pixel does.  It describes the Facebook Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people.  ***Find … people who have visited a specific page or taken a desired action on your***

---

[20] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[21] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[22] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

*website*."[23]

44.     Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log when someone takes an action on your website***.  Examples of actions include adding an item to their shopping cart or making a purchase.  ***The Pixel receives these actions, or events***, which you can view on your [Facebook Tracking] Pixel page in Events Manager.  From there, you'll be able to see the actions that your customers take.  ***You'll also have options to reach those customers again through future Meta ads***.[24]

45.     The Facebook Pixel code enables Facebook not only to help Defendant with advertising to its own users outside the Website, but also include individual users among groups targeted by ***other*** Facebook advertisers relating to the conditions about which users communicated on Defendant's Website.

46.     Facebook's Business Help Center explains:

> Meta ***uses marketing data to show ads to people who are likely to be interested in them***.  One type of marketing data is website events, which are ***actions that people take on your website***.[25]

47.     In other words, Facebook sells advertising space by highlighting its ability to target users.[26]  Facebook can target users so effectively because it surveils user activity both on and off its site.[27]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[28]

---

[23] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (emphasis added).

[24] *Id.* (emphasis added).

[25] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[26] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[27] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[28] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

48.     An example illustrates how the Facebook Pixel works. Take an individual who navigates to Defendant's Website and searches for particular genetic test. When that search button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Defendant's Website utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribes the content viewed and purchased, and the individual's identity.

49.     After collecting the information described in the preceding paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

## III.     DEFENDANT DISCLOSES THE IDENTITY OF USERS WHO TAKE A GENETIC TEST TO FACEBOOK IN VIOLATION OF THE GIPA

50.     Through implementing the Pixel on to the Website, Defendant discloses to Facebook the identities of individuals who purchase and take a genetic test.

51.     When a user accesses Defendant's Website and adds a genetic test to their shopping cart, Defendant discloses to Facebook what the user is purchasing. The following image depicts a user's screen when accessing their cart, which includes the specific genetic test being purchased:



52.    At the same time, Defendant sends to Facebook the following network

transmission:



53.     In the Universal Resource Locator ("URL") of the request, the red rectangle highlights that the individual user viewed a page (denoted by the "ev=PageView") and that it was viewed on Defendant's Website located at www.familytreedna.com.

54.     In that same network transmission, Defendant discloses precisely who the individual user purchasing the test is.  Defendant does this by disclosing an individual user's "c_user cookie," a unique identifier associated with a single Facebook user's Facebook profile ("Facebook ID" or "FID").  The cookie is a string of numbers that is unique to every Facebook account—distinguishing each FID from its peers.

55. Any person, even those without in-depth technical expertise, can utilize the FID to identify owners of the FID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the FID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook FID to www.facebook.com (www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular FID.

56. A user who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

57. The below highlighted portion of the same screenshotted network traffic shows Defendant disclosing a user's FID to Facebook via the Pixel when a user purchases a genetic test from their cart[29]:



---

[29] For the purposes of the Complaint, the full c_user has been redacted for privacy.

58.     The same is true for each page a user views on Defendant's Website. Relevant here, the only products sold by Defendant are genetic tests and a user may only create an account after ordering a test and receiving a "Kit Number."

59.     Therefore, the URLs transmitted to Facebook are indicative that the user has ordered and taken a test.  For example, when a user completes their order of a test, they are directed to the URL www.familytree.com/thank-you.  Facebook is thus made aware that an order was placed and by whom the order was placed by due to the Pixel.

60.     This is confirmed to Facebook once the user creates their account, in which the URL for their Dashboard, www.familytreedna.com/dashboardv2 is transmitted to Facebook by means of the Pixel.

61.     The same holds true for the URLs indicating a user is reviewing their results.

62.     Because these pages are only accessible after ordering and completing a genetic test, by transmitting to Facebook the "Page View" URLs through the Facebook Pixel, including the unique FID associated with the user, Defendant is disclosing to Facebook the identity of someone who took a genetic test.

63.     Even when a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

64.     One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook ID and browser identifier.[30]  Facebook, at a minimum, uses the fr cookie to identify users. [31]

---

[30] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[31] FACEBOOK, PRIVACY CENTER–COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

65.     If a visitor has never created an account, an even smaller set of cookies are transmitted.

66.     At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user. [32]

67.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website. [33]   Otherwise, the c_user cookie is cleared when the browser exits. [34]

68.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook. [35]   If that happens, the time resets, and another 90 days begins to accrue. [36]

69.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website. [37]   If that happens, the time resets, and another 90 days begins to accrue. [38]

---

[32] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policy/cookies/.

[33] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019),
https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[34] *Id.*

[35] *See id.*

[36] Confirmable through developer tools.

[37] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policy/cookies/.

[38] Also confirmable through developer tools.

70.     The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[39]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[40]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

71.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sent these identifiers alongside the event data.

72.     Defendant contracted or otherwise employed Facebook to utilize its Pixel on the Website and was aware it disclosed personal information of users, including their identity, to Facebook in order to show targeted advertising, as discussed above.

73.     By disclosing its consumers' genetic testing information to unauthorized third parties, including their identity and that they took a genetic test, Defendant violated the GIPA.

## CLASS ALLEGATIONS

74.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

---

[39] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[40] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

75.     Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as all persons in the State of Illinois who, during the class period, purchased a genetic test from Defendant and had their genetic testing information disclosed to Facebook by Defendant.

76.     Excluded from the Class are Defendant's officers and directors, Plaintiff's counsel, and any member of the judiciary presiding over this action.

77.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class may be expanded or narrowed by amendment or amended complaint.

78.     **Numerosity.**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Facebook.

79.     **Typicality**.  Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had his genetic information and identity disclosed to Facebook. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

80.     **Adequacy**.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of data privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

81. **Common Questions of Law and Fact Predominate/Well Defined Community of Interest**. Questions of law and fact common to the members of the Class and Subclass predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include whether Defendant conducts genetic testing under the GIPA and whether Defendant disclosed to third-parties the identity of a person who took a genetic test.

82. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for Class Members to obtain effective redress on an individual basis for the wrongs committed against them. Even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. It would also increase the delay and expense to all parties and the court system from the issues raised by this action. The class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## <u>COUNT I</u>
### Violation Of The Illinois Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/30 (On Behalf Of The Class)

83. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

84.     Defendant FamilyTreeDNA is a company and, therefore, a "person" under 410 ILCS 513/10.

85.     Plaintiff and the Class purchased a DNA test or tests from familytreedna.com and viewed the test results on familytreedna.com. Plaintiff and the Class reasonably believed their information, including their identities, would not be shared with third parties without their consent.

86.     As alleged, Defendant shares with Facebook the URLs while Plaintiff and Class Members navigated the Website, indicating that they have purchased and taken a genetic test through. The identity of Plaintiff and the Class are shared with Facebook through the Pixel.

87.     Because the only products sold on Defendant's Website are genetic tests, Facebook is made aware that a genetic test was purchased and taken, and by whom the test was purchased and taken by.

88.     This information constitutes "genetic testing" and/or "information derived from genetic testing" within the meaning of the GIPA because it reveals that a genetic test has been performed. 410 ILCS 513/15.

89.     Separate and independently, this information reveals "identity of any person upon whom a genetic test is performed … in a manner that permits identification of the subject of the test." 410 ILCS 513/30.

90.     Defendant did not obtain written authorization from Plaintiff or the Class members before disclosing this information to a third-party marketing company. 410 ILCS 513/30(a)(2).

91.     By disclosing this information, Defendant violated Plaintiff and the Class's statutorily protected rights to privacy in their genetic information as set forth in GIPA 410 ILCS 513/15 and 30.

92. Pursuant to 410 ILCS 513/40, "[a]ny person aggrieved by a violation of this Act shall have a right of action in a State circuit court or as a supplemental claim in a federal district court against an offending party."

93. Pursuant to 410 ILCS 513/40, a prevailing party may recover for each violation: (1) against any party who negligently violates a provision of the GIPA, liquidated damages of $2,500 or actual damages, whichever is greater; (2) against any party who intentionally or recklessly violates a provision of the GIPA, liquidated damages of $15,000 or actual damages, whichever is greater; (3) reasonable attorney's fees and costs, including expert witness fees and other litigation expenses; and (4) such other relief, including an injunction, as the State or federal court may deem appropriate.

94. On behalf of himself and the Class, Plaintiff seeks: (I) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to remove the Facebook Pixel from its platform and comply with the GIPA; (2) actual or statutory damages, in an amount to be proven at trial; and (3) reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

a. Certifying the nationwide Class and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class Members;

b. Declaring that Defendant's conduct violates the statutes referenced herein;

c. Finding in favor of Plaintiff and the Class against Defendant on all counts asserted herein;

d.  Awarding statutory damages, declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them all the money they are required to pay;

e.  Awarding Plaintiff and Class Members their costs and expenses incurred in the action, including reasonable attorneys' fees;

f.  Ordering Defendant to pay pre-judgment interest on all amounts awarded;

g.  Providing such further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 10, 2024                    Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By: _____*/s/ Philip L. Fraietta*_____
                                                     Philip L. Fraietta

                                            Philip L. Fraietta
                                            1330 Avenue of the Americas
                                            New York, NY 10019
                                            Tel: (646) 837-7150
                                            Fax: (212) 989-9163
                                            Email: pfraietta@bursor.com

                                            *Attorneys for Plaintiff*